IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Evelyn Buckle, #309884, )<br><br>Petitioner, )<br><br>v. )<br><br>M.C. Boulware, Warden, )<br><br>Respondent. )<br>———————————————————— ) | C/A No. 5:15-02088-TMC-KDW<br><br><br><br>REPORT AND RECOMMENDATION |

Petitioner Evelyn Buckle ("Petitioner") is a state prisoner appearing pro se who filed this Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. This matter is before the court pursuant to 28 U.S.C. § 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), for a Report and Recommendation ("R&R") on Respondent's Return and Motion for Summary Judgment. ECF Nos. 17, 18. On October 6, 2015, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th 1975), the court advised Petitioner to file a Response to Respondent's Summary Judgment Motion if she wished to pursue her case. ECF No. 19. On November 9, 2015, Petitioner filed a Response in Opposition to Respondent's Motion for Summary Judgment. ECF No. 22. Having carefully considered the parties' submissions and the record in this case, the undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 18, be granted.

I.     Background

Petitioner is currently incarcerated in the Graham Correctional Institution ("GCI") of South Carolina Department of Corrections ("SCDC"). ECF No. 1 at 1. In 2004, Petitioner was indicted at the October term of the Richland County Grand Jury for murder (2004-GS-40-7472) and homicide by child abuse (2005-GS-40-4243). App. 1884[1]; ECF No. 17-6 at 3-4. Attorney

---

[1] Citations to "App." refer to the Appendix for Petitioner's trial transcript, appeal from her sentence and conviction, and her claim for collateral relief in the state courts of South Carolina. That Appendix is available at ECF Nos. 17-1 through 17-5 in this habeas matter.

Nathaniel Roberson represented Petitioner in a jury trial that began June 13, 2005, and Assistant Solicitor Kathryn Luck Campbell represented the State. App. 1. Petitioner was tried before the Honorable Reginald I. Lloyd. *Id.* After the trial, the jury found Petitioner guilty of murder, and Judge Lloyd sentenced Petitioner to life imprisonment for the murder conviction. App. 993-1008.

Attorney Roberson timely sought a direct appeal of the conviction and sentence on Petitioner's behalf. ECF No. 17-6. Robert M. Dudek, Deputy Chief Attorney for Capital Appeals, represented Petitioner on appeal and briefed the following issue pursuant to *Anders v. California*, 386 U.S. 738 (1967):

> Whether the court erred by admitting evidence appellant never answered police questions about whether she had "anything to do with the death" of the victim, since the questioning occurred in a coercive polygraph examination setting where the results of that examination were inadmissible and any statements or refusals to talk emanating from it also should been (sic) excluded?

ECF No. 17-7 at 4. On September 4, 2008, the South Carolina Court of Appeals dismissed Petitioner's appeal and granted Attorney Dudek's motion to be relieved as counsel in an unpublished opinion. ECF No. 17-8. On September 22, 2008, the South Carolina Court of Appeals issued a Remittitur. ECF No. 17-9.

II.    Procedural History

Petitioner filed an application for Post-Conviction Relief ("PCR") on December 2, 2008 (2008-CP-40-8502). App. 1069-1076. Petitioner asserted the following allegations, recited verbatim, regarding her claims:

> a)  Ineffective assistance of counsel.
> b)  Third Party Guilt.

App. 1070. In the facts that support each claim, Petitioner indicated:

> a) Mr. Roberson put up no defense for me.
> b) The child who died was not in my possession when drugged.

2

*Id.* Additionally, Petitioner submitted approximately three pages of hand-written allegations as an attachment to her PCR application. App. 1074-76. Assistant Attorney General Brian T. Petrano filed a Return on behalf of the State. App. 1077-1083. Thereafter, Tricia A. Blanchette, Esq., submitted an "Amendment to Application for Post Conviction Relief" on Petitioner's behalf. App. 1084-1086. In the Amendment, Petitioner raised the following 15 ineffective-assistance-of-counsel claims:

1. Ineffective assistance of trial counsel for failure to properly prepare and investigate the Applicant's case prior to trial.
2. Ineffective assistance of trial counsel for failure to review the discovery and indictments, discuss and prepare defenses and ensure that the Applicant was fully and properly advised before trial.
3. Ineffective assistance of trial counsel for failure to utilize an investigator and/or experts prior to and at trial.
4. Ineffective assistance of trial counsel for failure to interview witnesses prior to trial and utilize witnesses at trial. Specifically, but not limited to, Johnnie Benjamin, Holmes Benjamin, Ron Bright, Lillian Duncan, Karen Casey, Paul Lyles, Daniel Lamare Benjamin, and [S.G].
5. Ineffective assistance of trial counsel during pre-trial motion hearings and for failure to file pre-trial motions, specifically regarding third party guilt.
6. Ineffective assistance of trial counsel for informing the Applicant of concerns (i.e. animosity) with trial judge, yet failing to address such concerns on the record or make the appropriate motion.
7. Ineffective assistance of trial counsel for failure review the Applicant's purported statements with her, call witnesses or present viable arguments during the <u>Jackson v. Denno</u> hearing and make proper objections to testimony regarding the Applicant's demeanor and statements at trial.
8. Ineffective assistance of trial counsel for failure to object to evidence of flight.
9. Ineffective assistance of trial counsel for failure to properly prepare and/or handle the testimony of Mary Green. Failure to present a third party guilt claim regarding Mary Green.
10. Ineffective assistance of trial counsel for failure to inform the Applicant of the State's witnesses and for failure to impeach and/or effectively cross-examine the State's witnesses at trial.
11. Ineffective assistance of trial counsel regarding the toxicology aspect of the case, specifically, but not limited to the following:
    a. Failure to discuss the toxicology aspect of the case with the Applicant.
    b. Failure to review and prepare for the State's toxicology evidence, witnesses, and expert witnesses at trial.
    c. Failure to utilize an independent expert.
    d. Failure to enter contemporaneous objections and effectively cross-examine the State's evidence and witnesses regarding toxicology.
    e. Failure to argue third party guilt on the issue of toxicology.
    f. Failure to show the jury that the Applicant did not fill prescriptions referenced by the State's witnesses.

12. Ineffective assistance of counsel for failure to discuss the insurance evidence and/or issue with the Applicant prior to trial, failure to make necessary objections and call appropriate witnesses at trial on this issue.
13. Ineffective assistance of trial counsel for failure to properly advise and prepare the Applicant to make an informed decision about testifying at trial.
14. Ineffective assistance of trial counsel for failure to present a viable post-verdict motion and provide effective assistance at sentencing.
15. Ineffective assistance of appellate counsel for failure to properly raise all meritorious issues on appeal.

*Id.* A PCR hearing convened on June 15, 2010, before the Honorable James R. Barber. App. 1088-1813. Petitioner was present and represented by Attorney Blanchette, Esq.; Assistant Attorney General Petrano appeared on behalf of the State. *Id.* The following witnesses testified during testified during the hearing: Brian Phillips, Johnnie Benjamin, Holmes Benjamin, Ronald Bright, Karen Casey, Lillian Duncan, Alton Fletcher, Daniel Lamar Benjamin, Kelly Jackson Benjamin, S.G., Robert Bennett, Petitioner, and trial counsel Roberson. App. 1088-1579. In an Order filed December 14, 2011, the PCR court denied Petitioner's PCR Application in full, making the following findings of fact and conclusions of law:

> This Court has had the opportunity to review the record in its entirety and has heard the testimony at the post-conviction relief hearing. This Court has further had the opportunity to observe the witnesses presented at the hearing, closely pass upon their credibility and weigh their testimony accordingly. Set forth below are the relevant findings of facts and conclusions of law as required pursuant to S.C. Code Ann. § 17-27-80 (1985).
>
> Brian Phillips testified that after the victim's death, he (Mr. Phillips) and the Applicant went to a retirement party. He explained that they used a borrowed car and that he was surprised when the State spun the Applicant's attendance at a party as evidence of flight.[4]
>
> The Applicant's mother testified that she at one point suggested to the Applicant that she get insurance on the victim. The Applicant's mother testified that she invited the Applicant to the gambling trip the date the victim died and that she (the Applicant's mother) was surprised when the State argued that the gambling trip was a pretext for the Applicant to plan an alibi for when her poisons would finally kill the victim.[5] The Applicant's mother explained that she was with the

---

[4] All of the Applicant's friends/family witnesses (and the Applicant herself) repeatedly testified to this Court that they were "surprised" of things that occurred at the trial.
[5] The evidence at trial showed that the Applicant told the victim's Head Start teachers that he would not be at school the next day (the day of his death); the

4

Applicant pretty much the entire time they were on the gambling trip and that she (the Applicant's mother) had her cell phone with her and that she did not recall the Applicant ever using the phone to call and check up on the victim. The Applicant's mother explained that the Applicant regularly used her (the Applicant mother's) car and that the victim's car seat was in that car.

The Applicant's father testified that he also told her to get insurance. The Applicant's father explained that he takes care of the bills in his family. However, the Applicant's father explained that he simply did not know if the Applicant was working or whether she had insurance, despite having received a gastric bypass operation. The Applicant's father testified that after her gastric bypass she received a prescription for a Lortab Elixir.[6] The Applicant's father explained that he went to several pharmacies trying to fill the Lortab Elixir prescription but that is was too expensive. He claims that he shredded the prescription after not being able to fill it. The Applicant's father explained that he arranged for trial counsel to represent the Applicant at trial and thought that the fee included a "team." The Applicant's father testified that he was surprised that no one was with trial counsel at the trial. The Applicant's father also explained that he was surprised he was not called to testify and explain that he was unable to fill that prescription. The Applicant's father explained that he contacted trial counsel after the trial and told him about a witness that had potential information, he explained that he was not sure if trial counsel ever bothered to contact that witness.[7] The Applicant's father explained that he thought the Applicant's laptop was seized as evidence.

The Applicant's brother testified that he met with trial counsel a few times. The Applicant's brother explained that it was his understanding that trial counsel was excellent and that he would have a team with him to assist. The Applicant's brother explained that there appeared to be friction between the trial judge and trial counsel. The Applicant's brother testified that he thought there were a lot of holes in the Applicant's case. As to whether he ever saw the victim drugged, the Applicant's brother testified that he never saw "anything of any concern." The Applicant's brother testified that he does not know how often the Applicant travelled to Jamaica. The Applicant's brother explained that the victim was the Applicant's son's son.[8]

Karen Casey testified that she is the Applicant's cousin and that they are best friends. The Applicant's best friend testified that she was with the Applicant and about five (5) others on the day long gambling trip the day the victim was killed.

---

Applicant claimed to this Court that those teachers were lying and she never said such a thing and in fact thought the baby sitter would be bringing the victim to school. *See generally,* transcript, p. 298. The Applicant's testimony was not credible.

[6] As explained in the records and testimony, the victim died from an overdose of hydrocodone that was (per the State's version of events) probably administered as an elixir, i.e. a Lortab Elixir.

[7] Trial counsel testified and explained that the witness was a Mr. Paul Lyles, who trial counsel did contact but who would not execute a sworn affidavit.

[8] This Court notes that the Applicant herself listed her Jamaican husband is listed as the victim's father on the birth certificate.

The Applicant's best friend explained that she gave the Applicant her cell phone number to give to the baby sitter in case they needed to call. The Applicant's best friend testified that the Applicant was distraught at the victim's funeral (this is contrary to the State's witnesses at the trial). The Applicant's best friend testified that she does think the Applicant's wedding in Jamaica was real and that she really does/did have a husband there – the Applicant's best friend explained that she has never actually physically met the Jamaican husband but she has seen pictures. The Applicant's best friend explained that the Applicant was a perfect mom. The Applicant's best friend testified that she has never seen the Applicant crush up pills. The Applicant's best friend testified that she does visit the Applicant at her prison and that they do not specifically discuss the death of the victim. The Applicant's best friend could not provide any sort of explanation as to the source of the victim and how he came to live with the Applicant, except that the victim's birth mother (Tomega) gave him up.[9]

Lillian Duncan, the Applicant's Aunt, testified that she was with the Applicant the day of the gambling trip. The Applicant's Aunt testified that the Applicant acted normally that day. The Applicant's Aunt explained that the victim's real mother (Tomega) lived in Georgia, then moved to Columbia, then moved back to Georgia. The Applicant's Aunt explained that it was her understanding that the Applicant's son (Dal Vero) was unfaithful to his wife and fathered the victim with Tomega.[10] The Applicant's Aunt explained that she never saw Tomega with the victim.

Alton Fletcher testified that he met with the family and/or trial counsel and that the meeting did not go as well as he had expected. He explained that he thought he would be a witness. He explained that he lived with Tomega after the victim was born but that she had no relationship (apart from giving birth to him) with the victim. He explained that he is not 100% sure why the Applicant was raising the victim.

Daniel Lamar Benjamin, the Applicant's son, testified that he too was surprised that trial counsel did not have a team. The Applicant's son testified that [referencing page 470 of the trial transcript] that he never knew of his mother to give children adult medication and that he had no concerns with her caring for children. The Applicant's son explained that he saw the victim and the Applicant on a regular basis.

The Applicant's son explained that she was sobbing the whole time at the funeral and that it was not a happy moment, he explained that it was his recollection that the Applicant was the one who arranged for doves to be added to the funeral. The Applicant's son explained that he watched the victim at his house on occasion and

---

[9] There is no evidence whatsoever that there was ever any sort of formal adoption of the victim by the Applicant. There is no evidence that the birth mother's [or father's] parental rights were terminated.

[10] Dal Vero did not testify at the PCR hearing, but he did testify at the trial. At trial, he explained that the victim was not his son. (Trial transcript, p. 440 L. 16). Dal Vero testified that from the onset, his mother (the Applicant) procured the victim as part of some sort of "scheme." (Trial transcript, p.448).

that the victim was always happy. The Applicant's son explained that he never paid rent to his mother.[11]

Kelly Marie Jackson Benjamin, the Applicant's daughter-in-law, testified that she had no problem with the Applicant watching her children. The Applicant's daughter-in-law explained that if she had ever received information that the Applicant had crushed up pills she would not have let the Applicant watch her children.[12] The Applicant's daughter-in-law explained that at the funeral the Applicant did appear non-emotional, but that she did so in attempt to hide it from the other children – but that she (daughter-in-law) could tell she (Applicant) was hurt. The Applicant's daughter-in-law testified that she did not recall the Applicant asking her to pick the victim up from school that day, but that she had done so in the past.

S___ G___ the Applicant's daughter, testified that she lived with the Applicant and the victim and treated the victim as if he was her brother. The Applicant's daughter explained that she was there when the house was searched and that she

---

[11] The significance of this seemingly odd question by the Respondent was later tied into a claim regarding the credibility of the Applicant because the Respondent attempted to admit her 1999 Bankruptcy Petition, which on Schedule One listed $450 monthly rental income to the Applicant from her son ("Lamar Benjamin"). Trial counsel later testified that he too was provided the Bankruptcy Petition in the discovery materials from the State and was aware that the State had ample material to challenge the Applicant's credibility if she were to testify at trial; the credibility of the Applicant was at issue, per the State, in multiple documents included: the bankruptcy petition, medical records, life insurance application information, property insurance claims, incident reports related to alleged burglary of her home, her regular travel to Jamaica as an unemployed person living off of disability, etc. When confronted with some of these items at the PCR hearing, the Applicant asserted her Fifth Amendment right against self-incrimination.

[12] This is relevant to the trial testimony of Amanda Wiseman at trial who testified that she observed the Applicant crushing up Tylenol (or generic) P.M. and administering it to children in her care. Wiseman testified that she informed the mothers of those children, including Ms. Jackson. (Trial transcript, p. 470 L. 24). This Court recognizes the conflicting testimony (Ms. Wiseman saying she did tell Ms. Jackson v. Ms. Jackson saying if she ever heard that she would not let the Applicant watch her children). Unlike the vast majority of the Applicant's other friends/family witnesses at the PCR hearing, Ms. Jackson actually had something substantive to offer. This Court did not find Ms. Jackson particularly credible. This Court noted the Applicant's friends/family in the gallery (there after their testimony) would regularly nod along with the incoming witness' testimony in an obvious attempt to keep the flow in the right direction. This Court also notes that indirectly, Ms. Jackson tended to agree that the Applicant was capable of improperly medicating children. Her explanation did not include any specific confrontation with the Applicant if it was relayed to her that the Applicant was improperly medicating children – she explained she would simply stop letting the Applicant watch her children after merely hearing about something like that – meaning she would readily believe the Applicant was capable of such behavior.

does recall the Applicant returning from her hair appointment during the search and that her hair procedure did not appear to be completed. *See*, trial transcript, p. 773 – 774. The Applicant's daughter explained that she did not know how much the Applicant spent on the victim's funeral but that the Applicant did not like the "toy" casket that was first offered.

The Applicant testified for the better part of the day. As a threshold matter, this Court notes that the transcript of the Applicant's testimony will surely reflect multiple instances of the Applicant becoming emotional, the Court Reporter may have noted this directly or it may be because the Applicant's attorney made note of it (when offering water or tissues). This Court is responsible for making credibility determinations and this Court has determined that the Applicant's emotional outbursts (crying) were not credible. Sure, she probably had a few genuine tears at times, but the vast majority of her outbursts were clearly a fabrication on her part. Apart from this Court's direct observation and evaluation of the Applicant's demeanor, this was confirmed by trial counsel's credible testimony that this PCR hearing was the first time he ever saw the Applicant shed a single tear. This Court is going to summarize the Applicant's testimony rather than paraphrase every point she made. The reasoning is threefold; first, the vast majority of the Applicant's testimony was just a review of the trial transcript and her telling this Court she was surprised by a certain fact or that she did not agree with it.[13] The Applicant's surprise/disagreement is not particularly relevant, nor was it credible. The Applicant's credibility was significantly hindered by her attempted explanation as to why, for example, the birth certificate and the life insurance paperwork (that she signed as true) were riddled with obvious lies. The State's case was not a surprise and (unlike the Applicant's claim to the contrary) trial counsel testified credibly that he fully reviewed the discovery materials with her. Second, despite the Respondent's repeated attempts to examine her credibility, the Applicant continued to assert her Fifth Amendment rights. The Respondent never moved to strike her testimony because of her reliance on her Fifth Amendment rights when her credibility was challenged with prior false statements.[14] This Court recognizes the negative inference afforded to such testimony.[15] Thirdly, trial counsel articulated valid strategic reasoning, and credibly testified that the Applicant agreed to not present her testimony at trial (in part because of the ample evidence relating to her credibility). Trial counsel explained that once it was determined that she would not testify, the

---

[13] Things such as how long she waited at the hair stylist (774), or whether she actually told Timmons that the victim was poisoned (252), etc.

[14] *See generally*, U.S. v. Cardillo, 316 F.2d 606 (1963) (explaining the three categories or approaches to take when considering if and how much testimony to strike when a witness refuses to answer questions claiming a constitutional right against self-incrimination).

[15] Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551, 1558, 47 L. Ed. 2d 810 (1976):

> Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a party to a Civil cause.["]

friends/family witnesses offered little if anything to gain and their testimony would preclude trial counsel's ability to retain final argument which he explained is important in a case like this with this particular Assistant Solicitor. As for an expert, counsel explained (see later portion of this Order) that his investigation and discussions with experts actually supported the State's timeline so he would not be presenting his own toxicologist. Because it was a valid decision for her not to testify at trial, her testimony now (supposedly to now tell her side of the story) is not really at all relevant. The decision was hers to make. (Trial transcript, p. 906 – 908). Therefore, mainly because of these three reasons, this Court is affording little more than this cursory mention of the Applicant's "testimony" at the PCR hearing.

Dr. Robert Bennett, over the Respondent's challenge/objections, was qualified by this Court to testify as to pharmacy and toxicology, i.e. to testify as to both presence and effect of drugs as well as general pharmacy.[16] Dr. Bennett's testimony is not particularly helpful to the Applicant at all. Dr. Bennett essentially confirmed the State's case/timeline, in that he agreed that the cause of death was hydrocodone poisoning and that even his timeline supported the Applicant's guilt _if_ a hydrocodone elixir was used (as opposed to tablets alone). Dr. Bennett testified that a valid prescription is not the only way to get drugs. Dr. Bennett explained to this Court that an elixir is simple to make from crushed tablets.[17] In fact, Dr. Bennett was thoughtful enough to bring a sealed test tube type vial of what he explained was a crushed up tablet mixed with water. It was obvious to the naked eye, and he explained, that the substance in the vial had a layered look to it. The water appeared to have separated from the wet powder materials. The good doctor explained that the liquid layer was not merely water, but was actually liquid hydrocodone because the hydrocodone was water soluble. The wet powdery layer was the "filler" substances otherwise contained in the hydrocodone tablet. Dr. Bennett's testimony revealed that a simple coffee filter would separate the suspended hydrocodone solution from the powdery materials. It was obvious to this Court that one could just as easily siphon off the liquid material. Dr. Bennett explained that to make the solution more palatable, a sweetener would be recommended and that honey or Kool-Aid would effectively convert the product to an easily drinkable (even tasty) homemade elixir. On re-direct, the Applicant attempted to suggest that this would require advanced pharmaceutical knowledge; however, the testimony before this Court revealed that such a process was disturbingly simple and required no complex knowledge whatsoever.[18]

---

[16] The Respondent's contention was that Dr. Bennett holds himself out as a pharmacist, yet his pharmacy license is admittedly inactive. The Respondent relied on S.C. Code § 40-43-30(39) and § 40-43-20 arguing that an active license is required for someone to hold themselves out as a pharmacist in this State. Dr. Bennett explained that his not an active pharmacist who dispenses drugs.

[17] It is not disputed that the Applicant had access to hydrocodone tablets.

[18] The Respondent alluded to what he claims is known on the street as "Purple-Drank," but Dr. Bennett testified that he was not familiar with that term.

Trial counsel testified that he recalled his representation of the Applicant.[19] Counsel explained his background, his 10 – 15 years of experience, his work at the Richland County Public Defender's Office (including some death penalty cases), and his vast experience in homicide defense work. Trial counsel testified that he early on went over the procedural basics with the Applicant, including bond. Counsel explained that he verified with the Applicant whether there was a trusted family member that he could discuss the case with, if she wanted – and that she referenced her family, including her father. Counsel explained that he does not mince words with his clients and that he would have told her that Judge Lloyd was probably not the best judge for a bond hearing and that once denied it would be difficult to get bond because circuit judges do not regularly overrule each other. Counsel explained that he is usually hesitant to do a Rule 5, SCRCrimP motion because of the reciprocity. Counsel explained that he gathered the discovery materials that he had and it was obvious that the toxicology report he had initially was a preliminary version. Counsel explained that he went through the entire box of discovery with the Applicant. Counsel explained that he went over the complete discovery with the Applicant in private so that she could reveal any confidences and so they could freely discuss whether she should testify on her own behalf.

Counsel explained that they went over everything piece by piece in full detail and discussed the implications of each bit of discovery. Counsel explained that he told the Applicant that there were some pitfalls that they would need to avoid. Counsel testified that the toxicology report would obviously be the State's main case and that he had a final copy of the autopsy report and that they may need to procure some experts as well. Counsel testified that he informed the Applicant that he would probably speak to three (3) experts in the field. Counsel explained that of the experts he spoke to one of which was a Dr. Joel Sexton.[20] Counsel explained that he reviewed the materials with the experts and that they all agreed that the State's experts' conclusions were substantially correct. Counsel explained that Dr. Sexton went even further.[21] Counsel explained that if they testified they would end up agreeing with the State's case. Counsel explained that there was no reason to call an expert who would ultimately, albeit on cross, support the State's case because you never want to give the State an opportunity to argue their case twice. Regarding the Applicant's friends/family witnesses, counsel explained that they had very little to offer in unbiased testimony and that there was a great risk that they could potentially open the door to the Applicant's character, habit, or routine. Counsel explained that the State was extremely eager to get the Applicant's credibility/character evidence before the jury and that they had to continuously avoid offering the State that opportunity.

---

[19] This Court notes that trial counsel was present for the entire duration of the Applicant's multi-day PCR hearing.

[20] Dr. Joel Sexton is a forensic pathologist. <u>Bailey v. State</u>, 392 S.C. 422, 425, 709 S.E. 2d 671, 673 (2011).

[21] The Applicant was clearly aware as to what Dr. Sexton told trial counsel because she argued fiercely to exclude trial counsel's testimony (hearsay) as to a version of events relayed by Dr. Sexton to trial counsel that would even further narrow the timeline and support the Applicant's guilt in administering this poison.

Counsel explained that the PCR hearing was the first time he saw the Applicant shed a tear. Counsel testified that he explained to the Applicant why he did not advise putting up any experts. Counsel explained that although he advised against it, it was ultimately her decision whether to testify. Counsel explained that if a client elects to testify then he gets another attorney and they will conduct a mock examination so that the client will know what to expect.

Regarding Paul Lyles, counsel explained that after the trial he was told that Mr. Lyles had some potentially relevant information. Counsel explained that he had trouble contacting Mr. Lyles, but that ultimately he did get in contact with him. Counsel explained that he told Mr. Lyles that he would need sworn testimony to support a motion for after discovered evidence. Counsel explained that he could not get Mr. Lyles to commit and execute an affidavit. Counsel explained that although he and Judge Lloyd have some friction at times, nothing of any significance occurred before the jury. Counsel explained that he did not lose the toxicology report, but that he had not received the final version and that if the State did send the final version he had not received it.

Counsel explained that he did not have a defense witness list because they did not intend on calling any witnesses. Counsel explained that in a case like this it would be important to keep the State from having last argument, especially with this particular Solicitor who is very good at summation and argument.[22] Counsel explained that he did not consider the State's closing argument to be egregious; he explained that he strategically does not want to act like a clown jumping up and down objecting to little things of minor consequence. Counsel explained that the State's closing argument (p. 963) did not amount to a personalization of the State's interest in the case. Counsel explained that the "muddy the waters" joke (p. 934) that the Solicitors tell is not worthy of an objection. Counsel explained that the State is allowed to summarize why a witnesses' (Ms. Green) testimony is credible. Counsel explained that he recalled that the jury had a color photo of Ms. Green's home.

Counsel explained that the State was supplementing materials, including stomach content report, close to the trial date but that he did review the State's case with his expert(s) and that he also spoke with the State's toxicologist. Counsel explained that he discussed the case with Dr. Sexton at least as late as June 8 regarding the State's case. The discussion on page 573 – 574 related to a supplemental report regarding whether the State had the gum tested, the Court sustained Counsel's motion. Counsel explained that the testing of the gum did not

---

[22] Counsel articulate valid strategic reasoning for not presenting evidence (not that any of the evidence presented at the PCR hearing was persuasive or prejudicial). Presenting the witnesses would have resulted in the waiver of counsel's right to last argument, which is a "substantial right." State v. Mouzon, 326 S.C. 199, 203-04, 485 S.E.2d 918, 921 (1997) (where a defendant in a criminal prosecution introduces no testimony, he is entitled to the final closing argument to the jury); State v. Pinkard, 365, S.C. 541, 543 617 S.E.2d 397, 398 (Ct.App. 2005) ("The right to open and close the argument to the jury is a substantial right, the denial of which is reversible error"); State v. Rodgers, 269, S.C. 22, 24-25, 235 S.E.2d 808, 809 (1977).

affect the timeline. This Court does not agree with the Applicant's position that the exchange occurring in that portion of the transcript proves that Counsel is incompetent.

Counsel explained that the State only had a conviction to impeach the Applicant relating to a bad check. However, Counsel explained that if she took the stand all the credibility matters would be fully available: the bankruptcy petition, medical records, life insurance application information, property insurance claims, incident reports related to alleged burglary of her home, her regular travel to Jamaica as an unemployed person living off disability, etc. Counsel explained that he did not ask and she did not tell him whether she killed the victim. Counsel explained that he always wants to maintain the ability to call a client to testify but not potentially expose himself to a claim of suborning perjury. Accordingly, Counsel explained that he sat down with the Applicant and laid out the State's case. He then asked her, if we cannot dispute the State's case, whether that would be an honest assessment of what happened that night. Counsel testified that the Applicant responded that she did not want to testify. Counsel testified that he still has a good relationship with the Applicant's family. Counsel explained that it was the Applicant's decision, but that he advised to not call Brian Phillips to testify because flight was not really an issue unless she knew the State was after her. Counsel explained why he did not call the witnesses the Applicant complains of, most are immaterial. For example, counsel explained that he did not give Alton Fletcher much thought because he was so hostile. Counsel explained that he did attempt to discuss things with Mary Green but she would not speak with him. As counsel explained, the Mary Green evidence came out via the State's witnesses and despite the Applicant's connection there is not much of a 3rd party guilt case here. The Applicant is the killer, not the babysitter she left her child with while she went off gambling and never called to check on throughout the long day.[23] Counsel explained that he did not cross examine the State toxicologist, Ms. Garvin, because his experts told him that her timeline was correct (in fact, his experts that he consulted with explained a scenario when the timeline would be even worse for the Applicant).

This Court notes that the Applicant attempted to spin the issue of the insurance policy into a situation where trial counsel's performance was deficient for failing to challenge the fact that the policy was not really in force. The Applicant attempted to confuse the issue date with the effective date of the policy and when the insurance company would find the claim payable (they ultimately did not pay because she lied on the application, including the fact that the insurance company discovered that she is not the victim's mother, also, she was the cause of his death). Trial counsel explained that the insurance manager (Mr. Gore) who testified at trial provided the requisite evidence to explain that the policy was indeed active (issue date v. effective date).[24]

---

[23] As noted above, the Applicant tried to claim that the Head Start teacher was lying when the teacher testified at trial and explained that the Applicant informed the school that the victim would be absent the next day (the day he was killed).

[24] Michael Gore testified that the policy/"policies were in effect…" (Trial transcript, p. 751 – 756).

**Ineffective Assistance of Appellate Counsel (Allegation 15)**

Regarding the Applicant's claims of ineffective assistance of appellate counsel, this Court finds the Applicant's claims to be without merit. The Applicant casually mentioned this at the hearing and did not really develop it at all. Nevertheless, appellate counsel filed an <u>Anders</u> brief. In <u>Anders v. California</u>, the United States Supreme Court announced the procedure an appointed attorney should follow if that attorney believes the client's appeal is frivolous and without merit. <u>Anders v. California</u>, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). The Supreme Court held the attorney could petition for permission to withdraw from the case, but that the petition for withdrawal must be accompanied by a brief "referring to anything in the record that might arguably support the appeal." Id. at 744. Under <u>Anders</u>, the defendant must be given time to respond and to raise any additional points after his attorney submits the <u>Anders</u> brief. Id. The court then is obligated to conduct a "full examination" of the record to determine whether the appeal is "wholly frivolous." Id. According to <u>Anders</u>, if the reviewing court finds the appeal is frivolous, "it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires." Id. at 744 (emphasis added). <u>State v. McKennedy</u>, 348 S.C. 270, 278–279, 559 S.E.2d 850, 854-855 (2002).

In the case at hand, Applicant's counsel filed an <u>Anders</u> brief with the Court of Appeals and the Applicant submitted her own *pro se* brief. "Upon the receipt of the pro se brief or the expiration of the period to file a pro se brief, this Court will then proceed to review the record as required by <u>Anders</u>. If no issue of arguable merit is discovered, the appeal will be dismissed and counsel's petition to be relieved will be granted." <u>State v. Williams</u>, 305 S.C. 116, 406 S.E.2d 357 (1991). In light of <u>Anders</u> and <u>Williams</u>, this Court finds there can be no legitimate allegation of ineffective assistance of appellate counsel because the reviewing court itself also conducted a full review of the record, and any *pro se* brief, and found there to be no issue of arguable merit. For this PCR court, a circuit court, to find ineffective assistance of appellate counsel when appellate counsel filed an *Anders* brief, this Court would – in essence – be overruling the appellate court's previous conclusion that there were no issue(s) of arguable merit.

> Appellate counsel filed an *Anders* brief, as opposed to a brief on the merits. Even in this context, when analyzing a claim of ineffective assistance of appellate counsel, **we** apply the *Strickland* test. *See Smith v. Robbins*, 528 U.S. 259, 284, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (finding that even where appellate counsel believes his client's appeal is without merit and thus files an *Anders* brief, the appellant may have been entitled to a merits brief and the challenge of appellate counsel's performance should be reviewed under *Strickland*.)

<u>Bennett v. State</u>, 383 S.C. 303, 309, 680 S.E.2d 273, 276 n.6 (2009) (emphasis added).

Even reviewing the ineffective assistance of appellate counsel issue under a <u>Strickland</u> analysis, this Court finds the Applicant has not satisfied her burden of proof – she has not articulated any sort of issue that could have/should have been raised on appeal that could possible [sic] amount to any prejudice.

In a post-conviction relief action, the Applicant has the burden of proving the allegations in the application. Rule 71.1(e) SCRCP; Butler v. State, 286 S.C. 441, 334 S.E.2d 813 (1985). Where ineffective assistance of counsel is alleged as a ground for relief, the Applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Strickland v. Washington, 466 U.S. 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692 (1984); Butler, 286 S.C. 441, 334 S.E.2d 813 (1985).

The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Butler, 286 S.C. 441, 334 S.E.2d 813 (1985). The Applicant must overcome this presumption to receive relief. Cherry v. State, 300 S.C. 115, 386 S.E.2d 624 (1989). Counsel's testimony is credible.

Court's use a two-pronged test in evaluating allegations of ineffective assistance of counsel. First, the Applicant must prove that counsel's performance was deficient. Under this prong, attorney performance is measured by its "reasonableness under professional norms." Cherry, 300 S.C. at 117, 385 S.E.2d at 625, (citing Strickland). Second, counsel's deficient performance must have prejudiced the Applicant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Cherry, 300 S.C. at 117-18, 386 S.E.2d at 625. As discussed above, the Applicant has failed to carry her burden in this action. Therefore, this Court finds that the application must be denied and dismissed. Accordingly, this Court finds Applicant has failed to prove the first prong of the Strickland test – that counsel failed to render reasonably effective assistance under prevailing professional norms. This Court also finds Applicant has failed to prove the second prong of Strickland – that she was prejudiced by counsel's performance.

"Strickland does not guarantee perfect representation, only a "'reasonably competent attorney.'" Harrington v. Richter, 131 S. Ct. 770, 791, 178 L. Ed. 2d 624 (2011). Hindsight is a perfect science, and it can always be argued that had the presentation made at the PCR hearing been made at the trial, the result could possibly (not probably) be different.

> To be deficient, counsel's representation must have fallen "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; and there is a "strong presumption" that counsel's representation is within the "wide range" of reasonable professional assistance, *id.*, at 689, 104 S.Ct. 2052. The question is whether counsel made errors so fundamental that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. Prejudice requires demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Harrington v. Richter, 131 S. Ct. 770, 778, 178 L. Ed. 2d 624 (2011).

A trial is a linear event that requires strategic decisions to be made, such as whether the defendant should testify. Unless an Applicant can demonstrate that the decision was unreasonable at the time, there can be no relief. PCR does not exist so an Applicant can calculatingly take a particular path at trial and when the path ends in guilt to then come in at PCR and want a do-over claiming that a different path could/would have resulted in an acquittal. "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."" Harrington v. Richter, 131 S.Ct. 770, 788, 178 L.Ed. 2d 624 (2011) (citing Strickland). There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others amounts to trial tactics rather than "sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (*per curiam*). There has been no demonstration of deficient performance on the part of trial counsel and there has been no demonstration of prejudice. The Applicant's claim for PCR is denied.

## CONCLUSION

Based on all the foregoing, this Court finds and concludes that the Applicant has not established any constitutional violations or deprivations that would require this court to grant her application. Counsel was not deficient in any manner, nor was Applicant prejudiced by counsel's representation. Therefore, this application for post-conviction relief must be denied and dismissed with prejudice.

Except as discussed above, this Court finds that the Applicant failed to raise the remaining allegations set forth in her application at the hearing and has, thereby, waived them. As to any and all allegations that were or could have been raised in the application or at the hearing in this matter, but were not specifically addressed in this Order, this Court finds Applicant failed to present any probative evidence regarding such allegations. Accordingly, this Court finds that Applicant waived such allegations and failed to meet her burden of proof regarding them. Accordingly, they are dismissed with prejudice. A waiver is a voluntary and intentional abandonment or relinquishment of a known right. Janasik v. Fairway Oaks Villas Horizontal Property Regime, 307 S.C. 339, 415 S.E.2d 384 (1992). A waiver may be express or implied. "An implied waiver results from acts and conduct of the party against whom the doctrine is invoked from which an intentional relinquishment of a right is reasonably inferable." Lyles v. BMI, Inc., 292 S.C. 153, 158-59, 355 S.E.2d 282 (Ct. App. 1987). The Applicant's failure to address these issues at the hearing indicates a voluntary and intentional relinquishment of her right to do so. Therefore, any and all remaining allegations are denied and dismissed.

This Court cautions the Applicant that she must file and serve a notice of appeal within thirty (30) days from the receipt by counsel of written notice of entry of judgment to secure the appropriate appellate review. See Rule 203, SCACR. Pursuant to Austin v. State, 305 S.C. 453 (1991), an Applicant has a right to an appellate counsel's assistance in seeking review of the denial of PCR. Rule 71.1, SCRCP, provides that if the applicant wishes to seek appellate review, PCR

counsel must serve and file a Notice of Appeal on the Applicant's behalf. Applicant and counsel are directed to Rules 203, 206, and 243 of the South Carolina Appellate Court Rules for the appropriate procedures to follow after notice of intent to appeal has been timely filed.

IT IS THEREFORE ORDERED:

1.     That the Application for Post-Conviction Relief must be denied and dismissed with prejudice; and

2.     The Applicant must be remanded to the custody of the Respondent.

App. 1814-1840. Thereafter, PCR counsel filed a "Notice of Motion and Motion for Rehearing Pursuant to Rule 59(a), SCRCP, and/or Motion to Alter or Amend Pursuant to Rule 59(e), SCRCP. App. 1842-1847. There, citing to the case of *Marlar v. State*, 653 S.E.2d 266 (S.C. 2007), Petitioner requested that the PCR court make "specific findings of fact and conclusions of law . . .on each issue and that the testimony of each witness [be] properly addressed." *Id.* at 1843. Additionally, Petitioner requested that the PCR court reconsider certain findings from its previous order. *Id.* On January 5, 2012, the PCR court held a hearing on Petitioner's Motion pursuant to Rule 59. App. 1848-1876. On January 31, 2012, the PCR court denied Petitioner's Motion in an Order of Dismissal. App. 1878-1883. In full, the second order of dismissal indicated:

This matter comes before this Court by way of Applicant's Motion for Rehearing and/or Motion to Alter or Amend Judgment pursuant to Rule 59, SCRCP. The Order of Dismissal in this matter was issued on December 12, 2011 and filed on December 14, 2011. The Applicant's motion is dated December 22, 2011 and explains that the Order of Dismissal was received on December 16, 2011. Accordingly, the Applicant's Rule 59, SCRCP motion is timely filed.

On January 3, 2012, this Court conducted a conference call with Tricia A. Blanchette, Applicant's counsel, and Brian T. Petrano, Assistant Attorney General. This Court made it clear that he was not going to reverse or reconsider the ultimate decision, but would be open to amend the Order if the parties agreed. After the conference call, the parties agreed to amend/explain some items of the Order and a proposed Order was submitted. Applicant's counsel also requested and this Court scheduled a motion hearing.

On January 5, 2012, a motion hearing was conducted at the Richland County Courthouse. The Applicant was present, along with her counsel. The State was represented by Brian T. Petrano, Assistant Attorney General. Both parties agreed

and this Court accepted the following changes/comments that shall be incorporated as part of this Court's Order of Dismissal:

> • The first sentence of footnote number eleven (11) is stricken.
> • Footnote twenty-one (21) is stricken.
> • Footnote eighteen (18) is stricken.
> • This Court notes for the purposed [sic] of appellate review that the remaining footnotes are absolutely part of this Court's Order and part of the Conclusions of Law and Findings of Fact. The footnotes are not immaterial items.

At the motion hearing, this Court also entertained arguments from both parties.[1] Applicant's counsel incorporated the written motion by reference and explained that she would present brief arguments on Applicant's request for reconsideration and request to alter or amend due to the above listed agreements. Applicant's counsel also explained her client's request that this Court obtain the evidentiary hearing transcript to ensure that the Order accurately reflected the testimony and evidence presented at the evidentiary hearing. In summary, Applicant's counsel argued that even if this Court would not alter his finding regarding Applicant's credibility, she asked this Court to reconsider the denial of the Application upon consideration of the testimony of Nathaniel Roberson, Esquire, Applicant's lay witnesses and Applicant's expert witness.

As to Mr. Roberson, counsel argued that the Order improperly summarized his testimony since it was her recollection that he spoke in general terms and when asked specific questions on cross-examination regarding matters in the trial transcript he failed to provide adequate answers. Furthermore, he testified that his strategy was to "avoid Judge Lloyd" yet the Order of Dismissal found his strategy to be reasonable. Counsel also explained that the Order of Dismissal relied heavily upon trial counsel's assertion that he consulted with multiple experts in the area of toxicology, which stands in complete contradiction to counsel's argument at trial that he had not received the toxicology report from the State. See Transcript p. 1062.

Turning to the lay witnesses, Applicant's counsel argued that trial counsel had a duty, at a minimum, to interview potential trial witnesses. Counsel also urged the Court to reconsider the testimony of each lay witnesses, and she argued that the testimony presented by the witnesses at the evidentiary hearing would have been outcome determinative at trial.

As to the Applicant's expert Dr. Robert Bennett, Applicant's counsel noted that the Order of Dismissal made findings as to the form of drugs (elixir), that caused the victim's death, yet the State's expert at trial, Dustin Smith of SLED, testified that he did not know the form of the drugs. Regardless of the form Applicant's counsel argued that Dr. Bennett's testimony, specifically regarding the stomach contents, would have been outcome determinative at trial. Most importantly, his

---

[1] At the close of the hearing, this Court allowed Applicant's counsel the opportunity to draft the Order of Dismissal on the Motion, from which this Order follows.

testimony would have called into question the timeline presented by the State's experts and clearly accepted by the jury.

Regarding the Order of Dismissal, Applicant's counsel argued that the Order failed to make specific findings of fact and state expressly the conclusions of law relating to each issue presented. See Marlar v. State, 375 S.C. 407, 653 S.E.2d 266 (2007), S.C. Code Ann. § 17-27-80 (2010). Applicant's counsel noted that each issue was listed in the Order, as listed below, but argued that the issues and evidence presented at the hearing were not properly ruled upon. By way of an Amendment, the Applicant added the following allegations to her original allegations, of ineffective assistance of counsel and failure to put up a defense, specifically, thirty [sic] party guilt:

[See 15 Ineffective-Assistance-of-Counsel Grounds as provided above]

While referring to the Order of Dismissal and above listed issues. Applicant's counsel went through the section entitled "Findings of Fact and Conclusions of Law" and argued that the Order lacked actual findings and would be more properly titled "Summary of the Testimony." As to the section on the lay and expert witnesses, counsel argued that the only finding regarding their testimony and the corresponding issues was contained in a footnote regarding Kellie Jackson Benjamin. Order p. 12, n.12. Turning to the section addressing the Applicant's testimony, counsel acknowledged that the Order made credibility findings based upon Applicant's emotional demeanor, addressed trial counsel's decision about the Applicant's testimony and touched on the utilization of an expert, but the Order failed to address the remaining issues raised through the Applicant's testimony. As to the section on trial counsel's testimony, counsel argued that the Order made one finding regarding counsel's strategy decision to not introduce any evidence and found that the "Applicant is the killer", but it failed to make findings as to all the other issues listed above. Order pp. 20, 22, n. 22.

In response, the State argued that Applicant's counsel was merely making stylistic complaints about the Order. The State also argued that all issues listed and evidence presented was properly addressed in the Order of Dismissal. The State also argued that the Order accurately reflected the testimony and evidence presented at the evidentiary hearing; therefore, reconsideration and or further amendment of the Order was not necessary.

In accordance with the State's argument, this Court is not persuaded to reconsider the dismissal of the Application. This court further finds that the Order complies with Marlar v. State, 375 S.C. 407, 653 S.E.2d 266 (2007), S.C. Code Ann. § 17-27-80 (2010) and the requirements of Rule 52(a) SCRCP. In the interest of complete clarity, this Court also finds as to each issue listed above regarding ineffective assistance of trial counsel, trial counsel was not ineffective for the reasons set forth in the Order of Dismissal.

IT IS THEREFORE ORDERED:

18

> 1. That the Applicant's motion for reconsideration as to this Court's ultimate finding is denied, however, the above changes/comments are to be considered part of the Order of Dismissal.

*Id.* PCR Counsel filed a Notice of Appeal on Petitioner's behalf, and Appellate Defender Susan B. Hackett filed a Petition for Certiorari. ECF Nos. 17-10, 17-11. Therein, Petitioner presented the following five issues for review:

> I.    In direct contravention of the statutory requirements and governing case law, the PCR judge's order denying Petitioner relief from her conviction and sentence failed to make specific findings of fact and state expressly the conclusions of law regarding each issue presented.
>
> II.   Trial counsel's failure to investigate and present evidence supporting third party guilt and failure to cross examine Mary Green regarding evidence of third party guilt violated Petitioner's Sixth Amendment right to the effective assistance of counsel.
>
> III.  Trial counsel's failure to utilize the services of an independent toxicology expert violated Petitioner's Sixth Amendment right to the effective assistance of counsel.
>
> IV.   Trial counsel's failure to interview witnesses and present evidence to counter the prosecution's claim that Petitioner fled from a police investigation violated Petitioner's Sixth Amendment right to the effective assistance of counsel.
>
> V.    Trial counsel's failure to object to the prosecutor's inaccurate and improper claim that Petitioner received $50,000 in insurance proceeds following the death of the decedent and failure to present evidence to counter the prosecutor's inflammatory remarks violated Petitioner's Sixth Amendment right to the effective assistance of counsel.

ECF No. 17-11 at 3. Assistant Attorney General Daniel Gourley filed a Return on behalf of the State. ECF No. 17-12. The South Carolina Court of Appeals denied the petition, and issued the Remittitur on January 5, 2015. ECF Nos. 17-13, 17-14. This federal habeas Petition followed and was filed on May 21, 2015. ECF No. 1.

III.    Discussion

A. Federal Habeas Issues

Petitioner raises the following issues in her federal Petition for a Writ of Habeas Corpus, quoted verbatim:

> GROUND ONE: Entrapment Defense
>                    Actual Innocence
> Supporting Facts: The State used the (Petitioner's) medical records to connect her with over dosing the (Deceased) althrough Dr. Robert Bennett testified at the P.C.R. hearing, that drugs were administered to the (Deceased) (outside) of the time frame, that the (Petitioner) had the (Deceased) in her care. (see) 1382 Line 18-22. ECF No. 1 at 5.

19

GROUND TWO: Prejudice/Inflammatory remarks by Prosecutor closing argument.
Supporting Facts: The (Petitioner) should be granted a new trial based on (Prosecutor) using (Inflammatory) remarks during his closing argument, remarks, were to calculate a wrongful conviction, and to persuasive the (jury), to accept his testimony as the sole fact finder in this case at bar (His TRUTH). *Id.* at 7.

GROUND THREE: Subject Matter Jurisdiction
Supporting Facts:  The lower court did not have subject-matter jurisdiction, to arrest prosecute the (petitioner) for this crime, based on the conflicting medical opinions the charge of murder, should've been ruled out, a charge of nelegence by child neglect. *Id.* at 8.

GROUND FOUR: 14th Amendment U.S.C.A.
                    Denied Due Process of Law
Supporting Facts:  The (Petitioner) was deprived of a fair jury trial, jury's findings should've been charged by with gross nelegence by child abuse, nelegence by child nelect, carelessness, child nelegence NOT GUILTY of Criminal Liability of Homicide by child nelect or abuse, but guilty of Child nelect. *Id.* at 10.

B.  Standard for Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts

20

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

C.  Habeas Corpus Standard of Review

1.    Generally

Because Petitioner filed her Petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of her claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir. 1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)(2); *see Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410.

a.  Deference to State Court Decisions

Courts afford deference to state courts' resolutions of the habeas claims of state prisoners.

*See Bell v. Cone*, 543 U.S. 447, 455 (2005). The Supreme Court has provided further guidance regarding the deference due to state-court decisions. *Harrington v. Richter*, 562 U.S. 86 (2011); *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. The Court further stated: "If this standard is difficult to meet, that is because it was meant to be." *Id.*; *see Richardson v. Branker*, 668 F.3d 128, 137-44 (4th Cir. 2012) (quoting *Harrington* extensively and reversing district court's grant of writ based on his ineffective assistance of counsel claims).

In interpreting § 2254(d)(1) and discussing the federal courts' role in reviewing legal determinations made by state courts, the United States Supreme Court held as follows:

> [A] federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . [clearly] established Federal law as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.

*Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (quoting from § 2254(d)(1)). "Clearly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). In considering whether a state-court decision is "contrary to" clearly established federal law, the federal court may not grant relief unless the state court arrived at a conclusion opposite to that reached by the Supreme Court on a legal question, the state court decided the case differently than the Court has on facts that are materially indistinguishable, or if the state court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the

22

facts of the prisoner's case." *Williams*, 529 U.S. at 405-13. The "unreasonable application" portion of § 2254(d)(1) "requires the state court decision to be more than incorrect or erroneous[,]" it "must be objectively unreasonable," which is a higher threshold. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citation omitted).

Section 2254(e)(1) requires the federal court give a presumption of correctness to state-court factual determinations and provides that a petitioner can only rebut such a presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Accordingly, a habeas petitioner is entitled to relief under § 2254(d)(2), only if he can prove, by clear and convincing evidence, that the state court unreasonably determined the facts in light of the evidence presented in state court.

b.   Ineffective Assistance of Counsel

The Sixth Amendment provides a criminal defendant the right to effective assistance of counsel in a criminal trial and first appeal of right. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court announced a two-part test for adjudicating ineffective assistance of counsel claims. First, a petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687. Second, the petitioner must show that this deficiency prejudiced the defense. *Id.* at 694. The United States Supreme Court's 2011 decisions cited previously elaborate on the interplay between *Strickland* and § 2254, noting the standards are "both highly deferential," and "when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted); *Pinholster*, 131 S. Ct. at 1403.

Further, in *Pinholster*, the Court held for the first time that the federal court's habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. 131 S. Ct. at 1398. The Court explained that "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399. In the *Pinholster* case, the district court had conducted an evidentiary hearing and considered new evidence in connection with its review

23

and granting of the petitioner's writ based on a finding of ineffective assistance of counsel. *Id.* at 1397. In an en banc decision, the Ninth Circuit Court of Appeals affirmed the district court's grant of the writ. *Id.* The United States Supreme Court granted certiorari and reversed the Ninth Circuit, finding that the district court should not have considered additional evidence that had not been available to the state courts. 131 S. Ct. at 1398. Because the federal habeas scheme "leaves primary responsibility with the state courts," and "requires that prisoners ordinarily must exhaust state remedies," the Court held that to permit new evidence to be presented in a federal habeas court "would be contrary to that purpose." 131 S. Ct. at 1399 (internal citation and quotation marks omitted).

When a petitioner raises in a § 2254 habeas petition an ineffective-assistance-of-counsel claim that was denied on the merits by a state court, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable[,]" not "whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (citing *Williams*, 529 U.S. at 410) (emphasis in original). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

            2.      Procedural Bar

Federal law establishes this court's jurisdiction over habeas corpus petitions. 28 U.S.C. § 2254. This statute permits relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States[,]" and requires that a petitioner present his claim to the state's highest court with authority to decide the issue before the federal court will consider the claim. 28 U.S.C. § 2254(a)-(b). The separate but related theories of exhaustion and procedural bypass operate in a similar manner to require that a habeas petitioner first submit his claims for relief to the state courts. A habeas corpus petition filed in this court before the petitioner has

appropriately exhausted available state-court remedies or has otherwise bypassed seeking relief

in the state courts will be dismissed absent unusual circumstances detailed below.

a.     Exhaustion

Section 2254 contains the requirement of exhausting state-court remedies and provides as

follows:

(b)     (1) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court, shall not be granted unless it appears
that—

(A)     the applicant has exhausted the remedies available in the courts of
the State; or

(B)     (i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to
protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits,
notwithstanding the failure of the applicant to exhaust the remedies available in
the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be
estopped from reliance upon the requirement unless the State, through counsel,
expressly waives the requirement.

(c)     An applicant shall not be deemed to have exhausted the remedies available in the
courts of the State, within the meaning of this section, if he has the right under the
law of the State to raise, by any available procedure, the question presented.

The statute requires that, before seeking habeas corpus relief, the petitioner first must

exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion

requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v.*

*Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) *overruled on other grounds by U.S. v. Barnette*, 644

F.3d 192 (4th Cir. 2011). Thus, a federal court may consider only those issues that have been

properly presented to the highest state courts with jurisdiction to decide them.

In South Carolina, a person in custody has two primary means of attacking the validity of

his conviction: (1) through a direct appeal; or (2) by filing an application for PCR. State law

requires that all grounds be stated in the direct appeal or PCR application. Rule 203, SCACR; S.C. Code Ann. § 17-27-10, *et seq.*; S.C. Code Ann. § 17-27-90; *Blakeley v. Rabon*, 221 S.E.2d 767, 770 (S.C. 1976). If the PCR court fails to address a claim as is required by section 17-27-80 of the South Carolina Code, counsel for the applicant must make a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP. Failure to do so will result in the application of a procedural bar by the South Carolina Supreme Court. *Marlar v. State*, 653 S.E.2d 266, 267 (S.C. 2007). Strict time deadlines govern direct appeals and the filing of a PCR in the South Carolina courts. A PCR must be filed within one year of judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

Furthermore, in filing a petition for habeas relief in the federal court, a petitioner may present only those issues that were presented to the South Carolina Supreme Court or the South Carolina Court of Appeals. *See State v. McKennedy*, 559 S.E.2d 850, 853 (S.C. 2002) (holding "that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing and certiorari following an adverse decision of the Court of Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error") (quoting *In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990)).

b.     Procedural Bypass

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner who seeks habeas corpus relief as to an issue failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts. In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). Bypass can occur at any level of

26

the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion.

The South Carolina Supreme Court will refuse to consider claims raised in a second appeal that could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the United States Supreme Court explains:

> [state procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed v. Ross*, 468 U.S. 1, 10-11 (1984).

However, if a federal habeas petitioner can show both (1) "'cause' for noncompliance with the state rule[,]" and (2) "'actual prejudice resulting from the alleged constitutional violation[,]'" the federal court may consider the claim. *Smith v. Murray*, 477 U.S. at 533 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). When a petitioner has failed to comply with state procedural requirements and cannot make the required showing of cause and prejudice, the federal courts generally decline to hear the claim. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

If a federal habeas petitioner has failed to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court. A federal court is barred from considering the filed claim (absent a showing of cause and actual prejudice). In such an instance, the exhaustion requirement is technically met and the rules of procedural bar apply. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Matthews*, 105 F.3d at 915 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *George v. Angelone*, 100 F.3d 353, 363 (4th Cir. 1996)).

27

3.     Cause and Actual Prejudice

Because the requirement of exhaustion is not jurisdictional, this court may consider claims that have not been presented to the South Carolina Supreme Court in limited circumstances in which a petitioner shows sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, *Coleman*, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. *Murray v. Carrier*, 477 U.S. at 495–96. A petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor that hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. *Id.* Absent a showing of cause, the court is not required to consider actual prejudice. *Turner v. Jabe*, 58 F.3d 924, 931 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. *Murray v. Carrier*, 477 U.S. at 492. To show actual prejudice, the petitioner must demonstrate more than plain error.

IV.     Analysis

A.  Procedurally Barred Grounds

As an initial matter, Respondent maintains that all of Petitioner's habeas grounds—as alleged in her Petition—are procedurally barred from habeas review. ECF No. 17 at 10-17. Petitioner does not specifically respond to the procedural bar argument in her Response to Summary Judgment. ECF No. 22. The undersigned will address each procedural bar argument in turn.

1. Ground One-Entrapment Defense/Actual Innocence

Respondent argues that Petitioner's allegation of "actual innocence in Ground One was not exhausted because it was not presented in State court proceedings" and "fails to state a claim upon which federal habeas corpus relief may be granted." ECF No. 17 at 10. Additionally, Respondent maintains that "to the extent that [Petitioner's] complaint in Ground One is that trial

28

counsel was ineffective for not retaining an independent toxicology expert, the issue was exhausted because it was the third issue raised in the Petitioner for Writ of Certiorari." *Id.*

Whether Ground One is procedurally barred is not entirely clear based on Petitioner's wording in the Ground One allegation. It appears that Petitioner takes issue with the State's use of her medical records to connect her with overdosing the victim. ECF No. 1 at 5. Additionally, it appears that Petitioner is alleging that trial counsel should have made an argument concerning third-party guilt based on Dr. Bennett's testimony concerning the time frame that drugs were administered and the time in which Petitioner had the victim in her care. *Id.*

An argument concerning the State's use of Petitioner's medical records to connect her with overdosing the victim is procedurally barred from review because it was not raised on direct appeal nor was it presented during PCR. However, third-party guilt was raised in the Amendment to Petitioner's PCR application at issue 9 and certain parts of issue 11. App. 1084-86. The PCR court did not rule on these precise issues and generally denied Petitioner's allegation of ineffective-assistance-of-counsel without going into each specific issue raised. Petitioner filed a motion to alter or amend the judgment and requested the PCR court issue an order that addressed the issues raised with specificity, citing to *Marlar v. State*, 653 S.E.2d 266 (S.C. 2007). App. 1842-1847. However, the PCR court did not address the claims with more specificity in its order denying the motion. App. 1878-1883. Consequently, the first issue raised in Petitioner's Petition for Certiorari to the South Carolina Supreme Court was the following:

> In direct contravention of the statutory requirements and governing case law, the PCR judge's order denying Petitioner relief from her conviction and sentence failed to make specific findings of fact and state expressly the conclusions of law regarding each issue presented.

ECF No. 17-11 at 6-9.

Based on Petitioner's efforts in attempting to obtain a direct ruling on the specific grounds raised in her PCR application, the undersigned finds that the issue of ineffective assistance of counsel related to the presentation of third-party guilt was presented to the state's

highest court for review. Further, the undersigned liberally construes Ground One as an argument pertaining to ineffective assistance of counsel in failing to adequately argue third-party guilt.[2] Therefore, the undersigned will address this argument on the merits.

### 2. Ground Two-Inflammatory Closing Argument

Respondent maintains that "Ground Two was not exhausted because it was not presented to the South Carolina Court of Appeals in the *Anders* Brief of Appellant filed on direct appeal, and Petitioner did not make a *pro se* response to the *Anders* filing." ECF No. 17 at 10. However, Respondent also maintains that "[t]o the extent that she is attempting to claim that trial counsel was ineffective in failing to object to these remarks or to present witnesses who could rebut the State's evidence, her claim was exhausted because it was presented as the fifth issue in the Petition for Writ of Certiorari." *Id.* at 10-11. The undersigned finds that Ground Two—to the extent it makes an ineffective-assistance-of-counsel argument concerning comments made during closing arguments—is not barred from habeas review. Therefore, the undersigned will review Ground Two in the merits section that follows.

### 3. Grounds Three and Four-Subject Matter Jurisdiction/Due Process

Respondent argues that Grounds Three and Four are barred from habeas review because "[n]either of these claims was exhausted because neither was specifically presented to the South Carolina Court of Appeals on direct appeal." ECF No. 17 at 11. Specifically, Respondent maintains these Grounds "were not presented to the South Carolina Court of Appeals on certiorari and they had not been presented in the PCR court or at trial." *Id.* The undersigned agrees that these claims are barred from habeas review because they were not presented to the state's highest court for review on the merits. *See e.g., Coleman v. Thompson,* 501 U.S. 722 (1991) (holding an issue not properly raised to the state's highest court, and procedurally

---

[2] The undersigned does not agree with Respondent's interpretation of Ground One as a claim for ineffective assistance of counsel for failure to obtain an independent toxicology expert as neither the Petition nor Petitioner's Response to the Motion for Summary Judgment mention use of toxicology expert in reference to Ground One.

30

impossible to raise there now, is procedurally barred from review in federal habeas); *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) ("[A] federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court."); *Williams v. Warden*, No. 4:08-2312-SB, 2009 WL 3052487, at *13 (D.S.C. Sept. 23, 2009) (finding that because petitioner "did not properly present this claim to the state's highest court in a procedurally viable manner when he had the opportunity, and the state courts would find any attempt to raise the claim now to be procedurally improper, then the claim is procedurally barred from review in federal habeas corpus"). Accordingly, the undersigned recommends dismissing Grounds Three and Four without review on the merits.

Concerning Grounds Three and Four, Petitioner may, nonetheless, overcome procedural defaults and have her claims addressed on the merits by showing either cause and prejudice for the default, or that a miscarriage of justice would result from the lack of such review. *See Coleman*, 501 U.S. at 750; *Savino v. Murray*, 82 F.3d 593, 602-03 (4th Cir. 1996). The existence of cause ordinarily turns upon a showing of: 1) a denial of effective assistance of counsel, 2) a factor external to the defense which impeded compliance with the state procedural rule, or 3) the novelty of the claim. *Murray*, 477 U.S. at 488. Having reviewed the record, evidence, and the parties' legal memoranda, the undersigned finds that Petitioner has not shown sufficient cause and prejudice to excuse the default of Grounds Three and Four. Thus, Grounds Three and Four are procedurally barred from consideration by this court and should be dismissed. *Mazzell v. Evatt*, 88 F.3d 263, 269 (4th Cir. 1996) (finding in order to show prejudice a Petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different); *Rodriguez v. Young*, 906 F.2d 1153, 1159 (7th Cir. 1990) ("Neither cause without prejudice nor prejudice without cause gets a defaulted claim into federal court.").

31

In order to demonstrate a miscarriage of justice, Petitioner must show she is actually innocent. Actual innocence is defined as factual innocence, not legal innocence. *Bousley v. United States*, 523 U.S. 614, 623 (1998). Petitioner cannot establish that the errors she complains of probably resulted in the conviction of an innocent person. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In order to pass through the actual-innocence gateway, a petitioner's case must be "truly extraordinary." *Id.* (internal citation omitted). The court's review of the record does not support a showing of any cause and prejudice or actual innocence to excuse the default. Thus, Grounds Three and Four are procedurally barred from consideration by this court and should be dismissed. The undersigned therefore recommends that Respondent's Motion for Summary Judgment be granted as to Grounds Three and Four.[3]

B.  Merits Analysis-Grounds One and Two

In Grounds One and Two, Petitioner makes arguments concerning the effectiveness of her trial counsel. The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  In *Strickland*, the Supreme Court held that to establish ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice. 466 U.S. at 687. Counsel renders ineffective assistance when his performance "[falls] below an objective standard of reasonableness," but there is a "strong presumption" that counsel's performance was professionally reasonable. *Id.* at 688-89. Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is Petitioner's burden to demonstrate both *Strickland* prongs. *Harrington*, 562 U.S. at 104.

---

[3] The Fourth Circuit has stated that once a claim is determined to be procedurally barred, the court should not consider the issue on its merits. *Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995). Accordingly, the undersigned will not discuss the merits of Grounds Three and Four.

1.    Ground One:  Ineffective Assistance of Counsel concerning Third-Party
Guilt

In Ground One, the undersigned has construed Petitioner's argument as a claim for ineffective assistance of counsel concerning the presentation of Petitioner's third-party guilt defense. Specifically, Petitioner argues that "drugs were administered to the (deceased) (outside) of the time frame that the (Petitioner) had the (Deceased) in her care." ECF No. 1 at 5.

During Petitioner's PCR hearing, trial counsel testified about the defense strategy. Specifically concerning Mary Green, the third-party who cared for the victim the day of his death, trial counsel acknowledged there was a picture from Green's home demonstrating prescription pill bottles. App. 1524. When asked why he did not point out the bottles in the picture to the jury, trial counsel responded:  "Because the officer testified that the drugs they found that were consistent with what was found in [victim's] body were not the drugs that they left in the house." *Id.* Further, trial counsel testified that some of the prescriptions found in the victim's body had been prescribed for Petitioner and Green. App. 1525. Trial counsel represented that he did not pursue a third-party guilt defense because there was no evidence of third-party guilt. App. 1526. Rather, he testified that their primary defense was that the government had to prove their case beyond a reasonable doubt. *Id.*

Here, without specifically addressing whether trial counsel erred in failing to raise third-party guilt, the PCR court held that trial counsel was not deficient and that Petitioner failed to demonstrate prejudice. The undersigned finds that Petitioner cannot show the PCR court unreasonably applied federal law or unreasonably applied the facts in denying relief upon this claim. Based on the evidence presented during Petitioner's trial, the undersigned does not find trial counsel erred in determining his trial strategy. Additionally, based on the forensic evidence concerning the timing of the victim's death, the undersigned finds that had trial counsel presented the defense of third-party-guilt that there is not a reasonable likelihood that the result of Petitioner's trial would be different.

Based on the testimony presented during Petitioner's criminal trial and during the PCR hearing and the evidence the State had against Petitioner, the undersigned finds the PCR court's application of *Strickland* was not unreasonable. Petitioner was unable to demonstrate that trial counsel was deficient in not pursuing a third-party-guilt defense under the first *Strickland* prong. Further, Petitioner also failed to meet the second *Strickland* prong. Accordingly, the undersigned recommends that Respondent's Motion for Summary Judgment be granted as to Ground One.

  2.  Ground Two: Ineffective Assistance of Counsel concerning Inflammatory Closing Arguments

The undersigned has construed Petitioner's second habeas ground as a claim for ineffective assistance of counsel for his failure to object to certain "inflammatory" comments the State made during closing arguments. ECF No. 1 at 7.[4] Petitioner argues she should be granted a new trial because the remarks made during the State's closing "were to calculate a wrongful conviction, and to persua[de] the (jury), to accept his testimony as the sole fact finder in this case at bar (his truth)." *Id.* Respondent argues that Petitioner failed to demonstrate either *Strickland* prong. ECF No. 17 at 33. Further, Respondent maintains that the PCR court's factual findings are supported by the record and "are not objectively unreasonable under § 2254(d)(2)." *Id.* at 33. Respondent also contends that Petitioner cannot demonstrate the State's closing arguments deprived her of a fair trial because the "Deputy Solicitor was arguing facts and reasonable inferences drawn from the evidence presented at trial." *Id.* at 38.

At the conclusion of Petitioner's criminal trial, during closing arguments, the State made several remarks concerning Petitioner's alleged motive. The undersigned has reviewed all the remarks, *see* App. 911-963, and notes that trial counsel did not lodge any objections to the

---

[4] This reviewable habeas ground is the fifth claim that was presented in Petitioner's Petition for Certiorari to the South Carolina Supreme Court: "Trial counsel's failure to object to the prosecutor's inaccurate and improper claim that Petitioner received $50,000 in insurance proceeds following the death of the decedent and failure to present evidence to counter the prosecutor's inflammatory remarks violated Petitioner's Sixth Amendment right to the effective assistance of counsel." ECF No. 17-11 at 2.

alleged inflammatory remarks. During the PCR hearing, trial counsel testified that during closing arguments, "[y]ou can argue anything that comes out on direct and all inferences to be drawn therefrom." App. 1547. Thereafter, PCR counsel asked trial counsel: "Do you think the solicitor was attempting to arouse any passion or prejudice with the jury in the closing argument?" App. 1550. Trial counsel responded: "I believe there is such a thing as inflammatory language where solicitors try and raise the passions and prejudices of jurors when they personalize their responsibility to rectify the State's desire to have them convict. I don't think this language went that far." *Id.* The questioning concerning the State's closing arguments was brief at the PCR hearing. As mentioned previously, the PCR court did not rule on specific allegations of trial counsel error but found that trial counsel was not deficient "in any manner, nor was [Petitioner] prejudiced by counsel's representation." App. 1839.

The undersigned finds the PCR court committed no error. As Respondent asserts, the standard warranting relief for an improper closing argument is very high. ECF No. 17 at 36. Further, Respondent argues no relief is warranted "unless that argument so infected the trial with unfairness as to make the resulting conviction a denial of due process." (*Id.* citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). In the case of *Donnelly*, the Supreme Court found that two statements made during closing arguments were improper but did not warrant reversal of a conviction. 416 U.S. at 646-48. There, the Court reasoned: "This is not a case . . . in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right." *Id.* at 643. Further, the *Donnelly* Court reasoned "we simply do not believe that this incident made [petitioner's] trial so fundamentally unfair as to deny him due process." *Id.* at 645.

This undersigned finds the Petitioner failed to meet her burden of proving trial counsel should have objected to the State's closing argument based on alleged inflammatory comments. First, the undersigned sees no basis for an objection in the statements made during the State's

closing arguments because they were adequately supported by reasonable inferences that could be made from the evidence presented during trial. *See Humphries v. State,* 570 S.E.2d 160, 166 (S.C. 2002) (holding that under South Carolina law, prosecutorial argument is not improper so long as it is based on evidence in the record and reasonable inferences from that evidence). However, even if error occurred, the undersigned does not find the outcome of Petitioner's criminal trial was affected. Prior to closing arguments, the trial court instructed:

> [C]losing arguments, like the opening statements you heard and the questions from the lawyers, is not evidence that's going to be considered by you once you begin your deliberations, but closing arguments are, again, another important part of the trial because it is an opportunity for the lawyers to argue to you their view of the evidence that was presented during the course of the trial.

App. 910. Additionally, the trial court reminded the jurors that they were the fact finders. *Id.* The PCR court's dismissal of Petitioner's claim of ineffective-assistance-of-counsel was not an unreasonable application of federal law because Petitioner failed to show that there is a reasonable probability that the result of her trial would have been different had trial counsel objected during the State's closing argument. Based on the findings that no error occurred and Petitioner suffered no prejudice, Petitioner has failed to demonstrate that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d) & (e)(1). As a result, the undersigned finds that Ground Two is without merit and should be dismissed.

V.    Conclusion and Recommendation

Wherefore, based upon the foregoing, the undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 18, be GRANTED and the Petition be DENIED.

IT IS SO RECOMMENDED.

May 12, 2016                                 Kaymani D. West
Florence, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

36